Randall R. BRADFORD *v.* DIRECTOR, Employment Security Department, and Department of Information Systems

E 02-348 128 S.W.3d 20

Court of Appeals of Arkansas
Divisions I and II
Opinion delivered November 5, 2003

*Eubanks, Welch, Baker & Schulze,* by: *J. G. "Gerry" Schulze,* for appellant.

*Allan Pruitt,* for appellee Director, Employment Security Department.

SAM BIRD, Judge. Appellant Randall Bradford appeals the decision of the Arkansas Board of Review that affirmed the denial of his application for unemployment benefits. Bradford was hired as the Executive Chief Information Officer (ECIO) of the State of Arkansas on October 15, 2001. On the morning of June 13, 2002, during a meeting with the governor's chief of staff, Brenda Turner, he submitted his letter of resignation to Governor Huckabee. The letter stated:

> Unfortunately, I have concluded that I must resign from my position as the Executive Chief Information Officer for the State of Arkansas for professional reasons. I do not believe that the current working environment within your staff is conducive to effective management. I am disappointed in the lack of leadership I have seen and I simply feel that we are not on the proper course.

In order to be effective, I would need to be allowed to work in a collaborative environment, with a spirit of cooperation, with my Information Technology Oversight Committee and the Joint Committee for Advanced Communications and Information Technology. Those relationships have been strained by your staff's attempts to restrict communications to the point that my office cannot be as effective as it should be.

I am proud of the accomplishments of my staff. The items outlined in Act 1042, Section 4, have been addressed and the results of our efforts can be seen on the website (www.cio.state.ar.us). To continue, however, under the restrictions that have been placed on me, would be detrimental to the citizens of the State of Arkansas. We have done all that we can do under these conditions. Therefore, I must resign my position. I am giving two weeks' notice effective today and wait to receive your instructions as to what you would like for me to do during this time.

Later the same day, Bradford received a letter from Turner stating, in pertinent part:

As a result of our meeting this morning, I have been directed by Governor Huckabee to terminate you from your position of State Executive CIO effective 12:00 noon today, June 13, 2002.

Following his termination, Bradford made application to the Arkansas Employment Security Department (ESD) for unemployment benefits, which that agency denied. He timely appealed that decision to the Arkansas Appeal Tribunal and then to the Arkansas Board of Review, both of which affirmed the ESD's decision. He now appeals to this court, arguing three points for reversal: (1) whether an employee who leaves his or her last work "because he is asked to violate the law" voluntarily and without good cause connected with the work leaves his or her last work for purposes of Ark. Code Ann. § 11-10-513; (2) whether there is substantial evidence in the record that he left his last work without good cause connected with the work; and (3) whether there is substantial evidence in the record that he failed to take appropriate steps to prevent or complain of the improper actions of the governor's staff. We affirm the decision of the Board of Review.

The findings of the Board of Review are conclusive if they are supported by substantial evidence. *Walls v. Director*, 74 Ark. App. 424, 49 S.W.3d 670 (2001). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* We review the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board's findings. *Lovelace v. Director*, 78 Ark. App. 127, 79 S.W.3d 400 (2002). Issues of credibility of witnesses and weight to be afforded their testimony are matters for the Board of Review to determine. *W. C. Lee Construction v. Stiles*, 13 Ark. App. 303, 683 S.W.2d 616 (1985). Even when there is evidence upon which the Board might have reached a different decision, the scope of judicial review is limited to a determination of whether the Board could reasonably reach its decision upon the evidence before it. *Id.*

Bradford, the only witness to testify at the hearing on this matter, testified that as the state's ECIO, he reported directly to the governor. He testified that he worked as ECIO until June 13, 2002, when he tendered his resignation. Bradford testified that after he tendered his letter of resignation, he gave an exclusive interview to a reporter from the *Arkansas Democrat-Gazette* and that he also called a press conference for that afternoon. Later that same day, Bradford received the termination letter from Brenda Turner.

Bradford testified that he had thought for a couple of months about resigning, and that he had confided with "key decision makers" and had written a letter a week before June 13. He said that he had started to feel uncomfortable in his job in January with one issue in particular, and that his uneasiness evolved over a period of time. Bradford testified that he believed he had been asked by personnel in the governor's office to violate the law or, at least, to violate ethical standards. Specifically, Bradford testified that he believed that he was being asked to violate Act 1042 of 2001 that created the ECIO position, to evade Arkansas's Freedom of Information Act, and to participate in a scheme by the state to illegally bill the United States Department of Health and Human Services for charges expended on information technology.

Regarding his contention that he was being asked to violate Act 1042, Bradford testified that the governor's office had asked him to do things that were inconsistent with his obligations under that Act. He testified that he had been instructed to be careful about involving the legislature in his work; not to allow the legislature to infringe upon the responsibilities of the administra-

tion and other agencies; and not to allow the legislature to "stick its nose in the administration's business." Bradford referred in his testimony to an email that came from a member of the governor's staff that stated in part:

> I would recommend as little direct interface with the [legislature] as you can get away with, there is nothing good to come from their involvement. I have dealt with Lindall and Gullet and Magnus and Kevin Smith for a while now. I can promise you that they have other agendas that will cause them to be less than altruistic with their dealings with you. You have a good reputation with the [legislature] right now, don't risk it through over-familiarity with them, nothing, capital Nothing, good ever comes from a committee meeting.

Bradford testified that the recommendation contained in this email violated Act 1042 because, under the Act, the ECIO was obligated to report to the legislature and to work with its Joint Committee on Advance Communication and Information Technology (JCACIT) and the Information Technology Oversight (ITO) Committee. He said that he had emails instructing him not to be completely forthcoming with members of the legislature, not to invite them to meetings of the ITO Committee, and not to trust the chairman of the ITO Committee because he had been nominated by the Democratic legislature. Bradford referred to and quoted several emails that he contended instructed him to withhold information from the legislature in violation of Act 1042.

Regarding his contention that he was asked by the governor's staff to evade Arkansas's Freedom of Information Act, Bradford testified that he was instructed to communicate with Governor Huckabee via the governor's private email address. He said that he believed that the purpose of this request was to avoid the obligation that he and the governor had under the Arkansas Freedom of Information Act. He further stated that the governor had at least two, and maybe three, email addresses. Bradford also stated that a member of the governor's staff came to him and told him to use the private email address that the governor had given to him and not to send anything to the governor's email address that he uses for official business. Bradford contends that this was an attempt to keep information about the Arkansas Administrative Statewide Information System (AASIS) computer program from the public.

Regarding his claim that he had been asked to participate in an illegal scheme to defraud the federal government, Bradford testified that he was asked to improperly allocate expenses of the state's AASIS computer system to the federal government by submitting inflated billings to the Arkansas Department of Human Services. He said that this would enable the state to obtain three-to-one matching funds from the U.S. Department of Health and Human Services under the Medicaid program for AASIS operating expenses that were not eligible for matching funds. He stated that this scheme "smacked" of fraud or of conspiracy to commit fraud.

The Board of Review affirmed the ESD's denial of benefits, finding that Bradford's resignation was equivalent to his "voluntarily leaving last work," relying on Arkansas Code Annotated section 11-10-513(a)(1) (2002), which provides that "an individual shall be disqualified for benefits if he or she voluntarily and without good cause connected with the work left his or her last work." We affirm the decision of the Board of Review.

In *Osterhout v. Everett*, 6 Ark. App. 216, 639 S.W.2d 539 (1982), we said:

> Although the Arkansas Employment Security Law is remedial in nature and must be liberally construed, *Harmon v. Laney*, 239 Ark. 603, 393 S.W.2d 273 (1964), the Act must be given an interpretation in keeping with the declaration of state policy, *Little Rock Furniture Mfg Co. v. Commissioner of Labor*, 227 Ark. 288, 291, 298 S.W.2d 56 (1947). Ark. Stat. Ann. § 81-1101 (Repl. 1976) sets forth the State's public policy of setting unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own*. We cannot say that appellant has become unemployed through no fault of his own since it was appellant's own action of resignation which set in motion the chain of events which ultimately resulted in his unemployment.

6 Ark. App. 216, 218, 639 S.W.2d 539, 540 (emphasis in original).

Applying our decision in *Osterhout* to the case at bar, the Board clearly could have viewed Bradford's resignation letter as a clear and unequivocal manifestation of his intention to leave his job as the state's ECIO. In his letter he expressed his inability to work with the governor's staff because of its lack of effective leadership, and he expressed the view that the state's information

technology program was not on the proper course. While express-
ing pride in the accomplishments of his staff, he stated that he
could not be effective as the ECIO under the restrictions placed
upon him by the governor's staff and that continuing as ECIO
under those restrictions would be detrimental to the citizens of the
State of Arkansas. Finally, he said that he would wait to receive the
governor's instructions as to what he should do during the two
weeks between the tender of his resignation letter and its effective
date.

This is exactly the situation we were discussing in
*Osterhout.* An employer should not be required to retain in its
employment an employee who has prospectively tendered his
resignation and acknowledged, as the reason for his resignation, his
inability to perform the job within the framework of the employ-
ment as determined by the employer. As a high-echelon employee
of the state's executive branch, answerable directly to the gover-
nor, Bradford was not immune from the imposition of restrictions
by the governor or his staff relating to Bradford's relationship with
the legislature, its committees, or individual members thereof,
where those restrictions did not contravene Act 1042.

We also note that section 1 of Act 1042 of 2001, which
Bradford contends that he was being asked to violate, provides:
"There is hereby created the position of Executive Chief Infor-
mation Officer, which shall be appointed by and serve at the will
of the Governor." Ark. Code Ann. § 25-33-103(a) (Repl. 2002).
We are aware of no authority that would permit an at-will
employee, as Bradford was, to resign from his job prospectively
and thereby defeat the authority of the employer to terminate the
employee "at will," prior to the resignation date desired by the
employee. The authority of the employer to accelerate the termi-
nation date becomes even more compelling where the employee
concedes, as Bradford did, that for the ensuing two weeks he was
not going to be able to perform his job because of restrictions
placed upon him by the employer. *See also Middleton v. Ark. Emp.
Sec. Div.,* 265 Ark. 11, 576 S.W.2d 218 (1979).

### First and Second Points on Appeal

For his first and second points on appeal, Bradford
argues that although he voluntarily resigned from his employment,

he did so with good cause connected with his work because he was asked by his employer to violate the duties imposed on him by Act 1042, to violate the Freedom of Information Act, and to participate in a scheme to defraud the federal government. We disagree with these arguments and hold that there is substantial evidence to support the Board's conclusion that, while Bradford voluntarily left his employment, he did so without good cause connected with his work.

We have carefully read the provisions of Act 1042 of 2001, codified at Ark. Code Ann. § 25-33-101 *et seq.* (Repl. 2002), with particular emphasis on Section 4(a), which sets forth the duties of the ECIO, and we find nothing in the Act that would preclude the Governor or his staff from imposing restrictions on the ECIO's working relationships with either the legislature, its committees, or its members. Of the fifteen subparagraphs contained in section 4(a), only four refer either directly or by implication to the legislature. Subparagraph 3, codified at Ark. Code Ann. § 25-33-104(a)(3), requires the ECIO to develop a process for how all state agencies shall have input into the formation of policies, standards and specifications, and guidelines relating to the retention, preservation, protection, and disposition of electronic records and to present the plan to the Governor and the General Assembly. Subparagraph 5, codified at Ark. Code Ann. § 25-33-104(a)(4), requires the ECIO to "[o]versee the development of legislation and rules and regulations affecting electronic records management and retention, privacy, security, and related issues." Subparagraph 8, found at Ark. Code Ann. § 25-33-104(a)(8), requires the ECIO to "[d]irect the development of policies and procedures, in consultation with the CIO Council, which state agencies shall follow in developing information technology plans and technology-related budgets and technology project justification." Lastly, subparagraph 13, codified at Ark. Code Ann. § 25-33-104(1)(13), requires the ECIO to "[m]ake a quarterly report to the Joint Committee on Advanced Communications and Information Technology regarding the status of information technology deployment to meet the goals set forth in this enabling legislation."

We do not see how any of the "restrictions" imposed by the governor's office on Bradford prevented him from performing any of these duties. As for subparagraph 3, Bradford did not testify that he had been restricted in any way by the Governor or his staff from reporting to the General Assembly his plan for the retention,

control, preservation, protection, and disposition of electronic records. While subparagraph 5's duty to "oversee the development of legislation" would probably entail some interaction with legislative committees and members, the only requirement imposed by subparagraph 5 is that the ECIO function in an oversight capacity as to the development of legislation. Bradford did not testify that he was restricted in any way in the performance of that duty.

Subparagraph 8 requires the ECIO to consult with the CIO Council[1] in the development of policies and procedures to be followed by state agencies in the development of information technology plans. Bradford complained that he was instructed by the governor's staff to give the CIO Council only such information as it requested, but to volunteer no information. He testified that when he informed the governor's staff that he had been invited to make monthly reports to the JCACIT on new policies, standards, and guidelines that his office was working on, he received a reply recommending "as little interface with the [legislature] as you can get away with, there is nothing good to come from their involvement...." He also testified that had been instructed not to be forthcoming with members of the Information Technology Oversight Committee (ITOC), not to invite members of the legislature to ITOC meetings, and not to trust the ITOC chairman because he was nominated by the Democratic legislature.

Subparagraph 13 requires the ECIO to make quarterly reports to the JCACIT as to the status of information technology deployment. Bradford does not contend that he was restricted in any way from making these reports. In fact, he testified that he was never prohibited from attending and reporting to JCACIT's quarterly meetings. Bradford was not required by subparagraph 13 to make monthly reports to the JCACIT on new policies, standards, and guidelines that his office was working on. Consequently, we do not consider that Act 1042 was violated when Bradford was discouraged by the governor's staff from making such reports.

---

[1] The CIO Council is created by § 5 of Act 1042 and is to be appointed by the governor with the advice of Information Technology Oversight Committee (ITOC), to be made up of representatives from state government, public education, cities, and counties. Its function is to advise the ECIO on information technology resource usage and prioritization. The record is silent to as whether any of the members of the Council were legislators, but Bradford did testify that the Chairman of the Council was nominated by the legislature.

While Bradford apparently interpreted the provisions of section 4(a) of Act 1042 to require him to do these things that he was encouraged not to do, we do not read the recitation of the ECIO's duties as prohibiting the governor and his staff from placing restrictions on the ECIO's activities that are neither expressly required nor prohibited by the Act. Bradford testified that he was unwilling to compromise his ethics and the integrity of the ECIO's office in order to curry favor with the administration, and that he could no longer remain silent about critical issues, which clearly warranted the oversight and intervention of the legislature. Certainly, Bradford is to be commended for adherence to his ethical standards. But the Board of Review found that the duties of his job as ECIO, as set forth in Act 1042, were not hampered in any way by limitations placed on him by the governor or his staff. Rather, his ethical principles appear to have interfered with his performance of his job in the manner requested of him by the governor and his staff, so he quit. The Board found that the evidence was insufficient to show that the instructions he received either circumvented the requirements of Act 1042, or constituted mistreatment for the purposes of unemployment law. The Board characterized the situation as a difference of opinion as to the legal requirements of the Act. The Board ruled that "[t]he preponderance of the evidence indicates that the interpretation of the governor's office was neither unreasonable nor illegal." We hold that the Board could reasonably have reached its decision upon the evidence before it.

Furthermore, the Board found that Bradford had not presented sufficient evidence to show that the requested limitation actually had a detrimental effect on his ability to perform his work. After reviewing Act 1042, along with testimony and evidence presented by Bradford, we hold that the Board could have reasonably reached its conclusion based on the evidence presented.

As to Bradford's contention that he had been asked by the governor's staff to violate Arkansas's Freedom of Information Act by communicating with the governor at his private email address rather than his official one, the Board found insufficient evidence to support the claimant's allegations. We hold that there is substantial evidence to support the Board's finding. It is the purpose of the Freedom of Information Act to ensure "that the public business be performed in an open and public manner so that

the electors shall be advised of the performance of public officials and of the decisions that are reached in public activity and in making public policy...." Ark. Code Ann. § 25-19-102 (Repl. 2002). To accomplish this purpose, the Act provides that public records shall be open for inspection and copying by any citizen, and it sets forth in detail how and when access to such records is to be afforded. Ark. Code Ann. § 25-19-105 (Repl. 2002). The Act also provides that, with some exceptions, all meetings of governing bodies supported by public funds shall be public meetings, and it sets forth the means by which the public is to be notified of such meetings. Ark. Code Ann. § 25-19-106 (Repl. 2002).

 We find nothing in the Freedom of Information Act that specifies that the communications media by which the public's business is conducted are limited to publicly owned communications. The creation of a record of communications about the public's business is no less subject to the public's access because it was transmitted over a private communications medium than it is when generated as a result of having been transmitted over a publicly controlled medium. Emails transmitted between Bradford and the governor that involved the public's business are subject to public access under the Freedom of Information Act, whether transmitted to private email addresses through private internet providers or whether sent to official government email addresses over means under the control of the State's Division of Information Services. Bradford provided no evidence of any emails that were generated as a result of having been sent to or from the governor's private email address to which a requesting citizen has not been provided access.

 As to Bradford's contention that he was asked to participate in a scheme to bill the United States Department of Health and Human Services for charges expended on information technology as ordinary expenses rather than billed, as they should be, for purposes of Medicaid reimbursement, the Board stated the following:

> [T]he Board finds insufficient evidence to support the claimant's conclusory allegations. Moreover, as noted by the Appeal Tribunal, the claimant's testimony indicates that this 'problem' arose in January, some six months before his separation. Given the remote-

ness in time to the date of the claimant's separation, the Board finds it improbable that this 'concern' played a significant role in the claimant's decision to quit.

Bradford points to nothing in the record other than his testimony to support this claim regarding billing. Once again, we note that issues of credibility of witnesses and weight to be afforded their testimony are matters for the Board of Review to determine. *W. C. Lee Construction v. Stiles, supra.* Given our standard of review, we hold that there is substantial evidence to support the Board's decision in this matter.

### Third Point on Appeal

As to Bradford's final challenge on appeal, whether or not there is substantial evidence in the record that he took the appropriate steps to prevent the improper actions of the governor's staff, the Board concluded:

> [T]he claimant's evidence fails to establish that he made any real effort to remedy what he perceived to be problems before quitting, or that it would have been futile for him to have made such an effort. In this regard, the Board notes that although the claimant alleged that he requested a meeting with the governor in January and that his request was not granted, his evidence does not support his contention. However, the claimant's testimony does indicate that he made further efforts to meet with the governor, or to contact the governor, although he had been given (as reflected in Exhibit 'P' to the claimant's federal complaint) various means by which he could contact the governor directly. Consequently, the Board finds that the claimant has failed to show, by a preponderance of the evidence, that he made a reasonable effort to rectify the perceived problems before quitting, or that it would have been futile for him to have made such effort.

Taking appropriate steps to prevent perceived misconduct from continuing is an element to be considered in determining whether an unemployment compensation claimant had good cause to quit work. *Ahrend v. Director,* 55 Ark. App. 71, 930 S.W.2d 392 (1996).

Concerning Bradford's contention that he was denied access to the governor, the Board further noted that "the email referred to by the claimant as conveying the governor's instructions, appears to actually provide the claimant with various avenues for

contacting the governor should the need arise." The Board further stated that "[i]n this regard, the Board also notes that this email directly contradicts the claimant's assertion that he did not have 'access' to the governor, and that such contradiction diminishes the claimant's credibility."

Finally, with regard to this issue, the Board stated that:

> [T]he vast majority of the emails sent, both by and to the claimant, show the claimant's 'official' email address of @mail.state.ar.us, and not the alleged 'private' address of @aol.com, which the claimant alleges he was instructed to use. This contradiction also diminishes the claimant's credibility.

Issues of credibility of witnesses and weight to be afforded their testimony are matters for the Board of Review to determine. *W. C. Lee Construction v. Stiles, supra.* Given our standard of review, we hold that the Board could have reasonably reached its conclusion based on the evidence presented.

Bradford contends in his reply brief that there is no evidence that he had access to the governor other than by violating the Freedom of Information Act; thus, he could not have attempted to resolve this matter without violating the law. He further contends that he made a written request to meet with the governor in January of 2002, but that his request was not honored. We have already discussed why the mere use of personal email to conduct the State's business is not a violation of the Freedom of Information Act. Furthermore, and as also discussed earlier, there is evidence in an email to Bradford that appears to fully support the Board's contention that Bradford had access to the governor if needed, as it appears to provide numerous ways in which to contact him. Given the evidence before the Board, we hold that the Board's decision that Bradford failed to rectify the perceived problems is supported by substantial evidence.

The dissenting opinion suggests that the majority opinion constitutes a holding that an employee's giving notice of intention to resign at a specified future date is tantamount to the employee's leaving his work as of the date his resignation letter is submitted. We believe that the dissenting judge reads our opinion too narrowly. What we hold is that when an employee submits a prospective resignation letter stating that he disagrees with the

leadership provided by the employer to the point that he can no longer effectively perform his job and that for the employee to continue on the job would be detrimental to the interests of the employer, there is substantial evidence to support the Board's finding of fact that the employee voluntarily left employment, notwithstanding that the employee would like to continue to be paid for another couple of weeks.

We also disagree with the assertion of the dissent that Bradford's resignation letter "established his clear intent and explicit desire to work for the full two weeks." To the contrary, Bradford's letter makes clear that although, in his opinion, he is no longer able to do his job without detriment to the interests of his employer, he would like the employer to suggest some other things he can do that will enable him to remain on the payroll for the next two weeks anyway, even though he is unable to do his job.

The dissent also disregards that Bradford conceded that his resignation was voluntary, and that he argued to the Board and this court only that he should not be disqualified from receiving benefits because his resignation was for good cause connected with his work. The Board found that Bradford's resignation was not for good cause connected with his work, and we have devoted a considerable part of this opinion to explaining why the Board's decision is supported by substantial evidence. Obviously, we are perplexed by the dissent's position that, because Bradford was fired (a position not even taken by Bradford), no consideration need be given to whether he left his job for good cause, the very point Bradford argues. The dissent's position also ignores Arkansas Code Annotated § 11-10-513(a)(1), which makes it clear that, in determining whether an employee is disqualified for benefits as a result of voluntarily leaving employment, the ESD must determine not only whether the employee left work voluntarily, but also whether the employee's leaving was without good cause connected with his work.

In sum, viewing the evidence, as we are required to do, in a light most favorable to the Board, and considering our limited review as to whether the Board could have reasonably reached its conclusion based on the evidence presented to it, we affirm.

Affirmed.

PITTMAN, GLADWIN, ROBBINS, and VAUGHT, JJ., agree.

GRIFFEN, J., dissents.

WENDELL L. GRIFFEN, Judge, dissenting. I cannot join the majority decision to affirm because there is clear and uncontradicted proof that appellant did not voluntarily leave his job, but was fired. The record shows that: (1) appellant tendered his letter of resignation the morning of June 13, 2002, and in that letter announced that he would leave his position in two weeks; (2) later that morning, the governor's chief of staff, Brenda Turner, learned that appellant planned to speak to the media about his work; and (3) Turner then faxed a letter to appellant which had the following opening sentence: "As a result of our meeting this morning, I have been directed by Governor Huckabee to terminate you from your position of State Executive CIO effective 12:00 noon today, June 13, 2002." Therefore, the finding by the Board of Review that appellant voluntarily left his employment lacks substantial evidence.

Further, I would not affirm under *Osterhout v. Everett*, 6 Ark. App. 216, 639 S.W.2d 539 (1982), and *Middleton v. Arkansas Employment Sec. Div.*, 265 Ark. 11, 576 S.W.2d 218 (1979). The facts of the instant case are distinguishable from the facts of those cases, and the court's mechanical application of the *Osterhout* decision is unsound.

In *Osterhout, supra*, an employee voluntarily gave notice that he would resign his employment nine days later because he needed the money that would be paid out of his unused vacation time. However, the employee attempted to withdraw the resignation prior to his last day of employment. *See Osterhout, supra.* The *Osterhout* court held that the employee was not entitled to receive unemployment benefits because he had not become unemployed through no fault of his own, when it was his own action of resignation that set into motion the chain of events that ultimately resulted in his unemployment. *See Osterhout, supra.* The *Osterhout* court reasoned that an employee's resignation is a final, unconditional event, which is not altered by the measure of time between the date that the employee gives notice and the actual date of separation from the job. *Osterhout, supra* at 218-19, 639 S.W.2d at 540 (quoting *Guy Gannett Pub. Co. v. Maine Employment Sec. Comm'n*, 317 A.2d 183 (Me. 1974)). The *Osterhout* court adopted the *Gannett* court's rationale that to hold otherwise would subject an employer to the wishes of an indecisive employee, and that the

employer must not be placed in "peril" when attempting to hire a replacement or otherwise adjust his work force in response to an employee's notice to quit.[1]

The majority also cites *Middleton, supra,* in which the Arkansas Supreme Court held that where an employee initiates the separation, the employer may accelerate the termination without liability for an involuntary discharge. *See Middleton, supra* (affirming the employer's acceleration of employee's termination date after she informed the employer that she would be looking for another job, reasoning that the Board could have found the employee said, "I'm quitting as soon as I'm able to find another job"). The *Middleton* court noted that the term "voluntary leaving" has been expanded to include a voluntary action indicating an intention to terminate employment.

As the majority correctly states, the Board's findings of fact must be supported by substantial evidence. *Walls v. Director,* 74 Ark. App. 424, 49 S.W.3d 670 (2001). In the present case, the Board cited *Middleton, supra,* stating:

> [T]he evidence establishes that he tendered a letter of resignation. Although the employer may have accelerated the date and time of his separation, this does not alter the fact that the impetus leading to the separation came from the claimant and not the employer. [Citation omitted.] Thus, the Board finds that the claimant voluntarily left his last work; he was not discharged.

Despite the majority's assertion, this is not "exactly the situation we were discussing in *Osterhout.*" There was no evidence in this case that appellant submitted his resignation in order to receive a pecuniary gain, or attempted to rescind his notice, as the employee did in *Ousterhout.* Nor was this like *Middleton,* where the employee informed her employer that she would be leaving at

---

[1] The *Osterhout* court's concern for an employer's "peril" would appear to be unwarranted in view of today's decision. If an employer may accelerate an employee's date of termination regardless of circumstances, and with no consequence to the employer, then an employee has no motivation to give the employer any notice before leaving. Nothing in the majority opinion sheds light on how the prospect of workers leaving their jobs without giving notice works a benefit to employers whose "peril" appears to have motivated the holding in *Osterhout.*

some unspecified date. Thus, unlike the situations in *Osterhout* and *Middleton*, there was no threat of uncertainty or instability for the governor's workforce.

To the contrary, appellant's resignation letter and his request for direction of his duties over the next two weeks established his clear intent and explicit desire to work for the full two weeks. There would be no question of whether appellant's departure was voluntary if he had been allowed to work the full two weeks, as he desired to do. Nor would there be any question if the governor's office had asked appellant to make his resignation effective as of the day the resignation was submitted, and appellant had complied. However, the plain truth is that the governor's office chose to terminate appellant, rather than accept his resignation. Where as here, the facts show that the employee gave notice and intended to work throughout the notice period, the concerns noted in *Osterhout* and *Middleton* simply are not present.

Further, the majority's mechanical application of the *Osterhout* decision is unsound. Under *Osterhout*, where an employee has given notice, he is deemed to have become unemployed through his own fault, and therefore, is ineligible to receive unemployment benefits. The rationale is that, because the employee has initiated the separation, the employer should be allowed to merely accelerate the separation. While this reasoning is facially appealing, the effect on the employee-employer relationship is more far-reaching than merely accelerating the separation.

Under today's decision, an employer may consider an employee's separation date to be the date that notice is given, regardless of the date that the employee intends to leave or regardless of the employer's conduct. That is, an employer may accelerate the date of separation and discharge an employee prior to the date that the employee intended to quit, and the employee is still considered to have *voluntarily* left as of the date the employer discharged him or her, regardless of the employer's behavior. The focus of the inquiry improperly shifts from the facts and circumstances of each case to the date that notice is given; thus, the analysis becomes temporally based, rather than factually based. In addition, judicial assent to an employer to fire an employee who has given notice, without consideration of the attendant circumstances, enables the employer to do what it could never do in the absence of notice: to fire a worker without liability to pay unemployment benefits for the employee's involuntary discharge.

The majority states that "the Board clearly could have viewed Bradford's resignation letter as a clear and unequivocal manifestation of his intention to leave his job." This is correct. Obviously, a letter of resignation or giving notice by any other method evinces a clear and unequivocal intent to terminate one's relationship with an employer. However, even under *Middleton*, the question is not merely, "Did the employee engage in a voluntary action indicating an intent to terminate employment?" Mere proof of an intent to quit does not constitute quitting a job.

The majority's decision now allows the Board to conclude that by submitting a letter of resignation an employee is voluntarily leaving work. The problem with this reasoning is readily apparent: it is conclusory. Simply stated, the fact that appellant submitted a resignation letter did not, *ipso facto*, mean that his subsequent unemployment was voluntary. How could appellant's unemployment be voluntary if he was fired? How could the letter from Brenda Turner, Governor Huckabee's chief of staff, stating, "I have been directed by Governor Huckabee to terminate you from your position . . . effective 12:00 noon today, June 13, 2002," mean that appellant was not fired? How could appellant resign and be fired from the same employment?[2]

Whether an employee voluntarily leaves his or her employment when an employer accelerates the date of separation is a question of fact for the Board to decide. *See Middleton, supra.* However, the majority's application of *Osterhout* transforms that issue of fact into an issue of law, by holding that an employee's giving notice to leave employment at a specified future date is tantamount to the employee voluntarily quitting work as of the day the resignation is submitted. An employee who quits *without* notice may draw unemployment benefits if he can show that he involuntarily left for good cause associated with the work. *See* Ark. Code Ann. § 11-10-512 (Repl. 2002). However, under the decision announced today, an employee who *gives* notice will never be able to establish those proper circumstances. In short, employees

---

[2] Of course, one can also conceive of situations where a resignation notice is anything but voluntary, as when the employee is given the choice of resigning or being fired. And in the case of the "whistle-blower" employee whose efforts expose an employer to unwanted scrutiny or criticism, it is quite conceivable that such a resignation notice would be both involuntary and with good cause connected to the work. Today's decision appears to gloss over these realities by slavish application of the holding in *Osterhout*.

will be penalized for giving notice. This does not comport with the purpose of our unemployment laws to protect employees from economic hardship caused by involuntary loss of employment. Moreover, it makes no sense.

The employer cannot have it both ways. If the employer's conduct during the notice period is relevant to determining whether the employee is voluntarily leaving employment, then that factual determination must not turn solely on whether the employee submitted a letter of resignation or otherwise provided notice. If the employer's conduct during the notice period is *not* relevant, then the employee's conduct should not be used, as it was here, as a justification to automatically allow the employer to accelerate the employee's date of separation without liability for the employee's involuntary discharge.

My position does not undermine the employment-at-will doctrine; nor does it mean that an employer would be required to retain an employee who has tendered his resignation or would be unable to fire an employee at will. However, it would require that the Board of Review make a factual determination based on all of the evidence, not merely rush to conclude that a worker voluntarily left his job merely because he gave notice of the intent to do so at a future date and despite all proof of the employer's conduct. Here, where appellant was fired, it is unnecessary to determine whether he voluntarily left his job for good cause. Because the record clearly demonstrates that appellant was fired by the governor's office, I respectfully dissent from today's holding that affirms the Board's decision to deny appellant unemployment benefits.