SOUTHWESTERN BELL TELEPHONE, L.P. *v.*
DIRECTOR of Arkansas Employment Security Department
and Stephen E. Barkley

E 04-385          218 S.W.3d 317

Court of Appeals of Arkansas
Opinion delivered November 30, 2005

[Rehearing denied January 4, 2006.*]

---

\* CRABTREE, J., would grant rehearing.

*Cynthia A. Barton* and *H. Edward Skinner;* and *Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.,* by: *Hermann Ivester* and *Laney G. McConnell,* for appellant.

*Alan Pruitt,* for appellees.

ANDREE LAYTON ROAF, Judge. Appellant Southwestern Bell Telephone appeals from the November 8, 2004 Board of Review's decision granting unemployment benefits under Ark. Code Ann. § 11-10-513(c) (Supp. 2003) to appellee Stephen Barkley, who voluntarily participated in a work-force reduction process. On appeal, Southwestern Bell argues that the Board's decision that Barkley left his employment after it "asked for volunteers"

for a permanent work force reduction is not supported by substantial evidence and that it amounts to an erroneous construction of Ark. Code Ann. § 11-10-513(c). We affirm.

Barkley, who began working for Southwestern Bell in 1974, ended his employment as a cable-splicing technician on July 8, 2003, after participating in Southwestern Bell's Voluntary Severance Program ("VSP"). Southwestern Bell's collective bargaining agreement requires it to offer eligible employees the opportunity to sign up for a voluntary severance package when it determines that there is a surplus of employees in a certain area and that a work force reduction will be necessary. Participation in this VSP is based on seniority, and the most senior employees are allowed to participate until the workgroup that contains a surplus is reduced by the required number of employees. Southwestern Bell will only begin to lay off employees when not enough eligible employees participate in the VSP, and it will begin with the least senior employee first.

Southwestern Bell announced a surplus in Paragould in the summer of 2003. Barkley was employed in Jonesboro, but Paragould is within his force adjustment area. According to Barkley, there was not a surplus within his particular workgroup, but he was eligible for the VSP because there was a surplus within his force adjustment area. He requested a "Voluntary Candidate Request Form" from his manager and filled it out on May 9, 2003, stating that he wished to participate in the VSP. Barkley then received a "Voluntary Severance Candidate Request Conditional Offer," which stated that his form had been received and that the company was trying to establish a pool of voluntary severance candidates. The letter explained that Southwestern Bell was trying to determine if Barkley would be willing to accept an offer should a match be made for his position. The letter also stated that, if Barkley decided he was willing to accept the offer and sign the form, his decision was irrevocable.

Barkley signed this document on June 30, 2003. He testified that he had applied for the VSP and had been made conditional offers on prior occasions but that he did not accept the offers at those times because he was not "ready to go." In this instance, Southwestern Bell offered Barkley a severance payment of $46,700, a lump sum pension payment of approximately $244,000, and a $4000 payment for vacation days not taken. Barkley decided to take the offer, and Southwestern Bell matched him with another employee in Paragould, who would have lost his job had Barkley not accepted the voluntary severance offer. Barkley testified that

his job was not in jeopardy at that time and that he could have continued to work at Southwestern Bell if he had not participated in the VSP. According to Barkley, it was "general knowledge" within the company that the VSP was available once there was an announced surplus. He stated that no one at Southwestern Bell approached him and asked him to volunteer.

Allen Jay Simmons, Barkley's workgroup manager, testified that Barkley was one of the employees in his workgroup and that Barkley asked to fill out the "Voluntary Candidate Request Form" after the surplus was announced within his force adjustment area. He corroborated Barkley's testimony that Barkley's job was not at risk. According to Simmons, he kept the VSP forms on his desk so that an employee could request the form, fill it out, and send it in. He stated that the employee from Paragould who was matched with Barkley had taken over Barkley's position in Jonesboro.

After leaving his employment with Southwestern Bell, Barkley was denied unemployment compensation by the Arkansas Employment Security Department (ESD) on the basis that he voluntarily and without good cause left his work. Barkley appealed to the Appeal Tribunal, and it reversed the ESD's decision and awarded him unemployment benefits, finding that he was discharged from his last work for reasons other than misconduct in connection with the work. Southwestern Bell then appealed to the Board of Review, and it affirmed and modified the Appeal Tribunal's decision. It found that Barkley was entitled to benefits under Ark. Code Ann. § 11-10-513(c), because he voluntarily participated in a permanent reduction in the employer's work force after the employer had announced a pending reduction and asked for volunteers.

Southwestern Bell appealed the Appeal Tribunal's decision to the Arkansas Court of Appeals, arguing that the Board's decision was not supported by substantial evidence and that it amounted to an erroneous construction of § 11-10-513(c). This court reversed and remanded the case so that the Board could make a finding as to whether, and if so, in what manner, Southwestern Bell asked for volunteers pursuant to § 11-10-513(c). Upon remand, the Board of Review, in its opinion dated November 8, 2004, found that Southwestern Bell did ask for volunteers within the plain meaning of § 11-10-513(c) and held that Barkley was entitled to unemployment benefits. Southwestern Bell now appeals the decision of the Board of Review, arguing again that the Board's decision was not supported by substantial evidence and that it amounted to an erroneous construction of Ark. Code Ann. § 11-10-513(c).

On appeal, the findings of the Board of Review are affirmed if they are supported by substantial evidence. *Billings v. Director*, 84 Ark. App. 79, 133 S.W.3d 399 (2003). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* We review the evidence in the light most favorable to the Board's findings. *Id.* Even where there is evidence upon which the Board might have reached a different conclusion, appellate review is limited to a determination of whether the Board could reasonably reach its decision upon evidence before it. *Id.*

Arkansas Code Annotated section 11-10-513(a)(1) (Supp. 2003) states that "an individual shall be disqualified for benefits if he or she voluntarily and without good cause connected with the work left his or her last work." The legislature, however, added a new subsection to this statute that became effective on April 11, 2003, which states:

> (c)(1) No individual shall be disqualified under this section if he or she left his or her last work because he or she voluntarily participated in a permanent reduction in the employer's work force after the employer announced a pending reduction in its work force and *asked for volunteers.*
>
> (2) Such actions initiated by the employer shall be considered layoffs regardless of any incentives offered by the employer to induce its employees to volunteer.
>
> (3) Any incentives received shall be reported under § 11-10-517.

(Emphasis added.)

Southwestern Bell does not dispute the fact that it had declared a surplus in certain workgroups, but it argues that there was no evidence that it "asked for volunteers" for the VSP, as is required under Ark. Code Ann. § 11-10-513(c)(1). According to Southwestern Bell, Barkley chose to apply for the VSP without being asked to volunteer, and the Board's finding that it asked for volunteers by making this option available to its employees is an erroneous construction of the statute.

The VSP at issue in this case has previously been addressed by this court in the context of Ark. Code Ann. § 11-10-513 in *Billings, supra.* This court held in *Billings* that employees who chose

to leave their employment with Southwestern Bell by participating in the VSP were not entitled to unemployment benefits under § 11-10-513. The 2003 amendment to § 11-10-513, however, was not in effect at the time these employees were denied benefits. In the present case, the 2003 amendment that added subsection (c) to § 11-10-513 was applicable at the time of Barkley's separation from his employment and the Board's decision. In fact, the Board awarded benefits to Barkley pursuant to Ark. Code Ann. § 11-10-513(c).

■ The intent of the Arkansas Legislature controls the construction of our unemployment security laws. *Feagin v. Everett,* 9 Ark. App. 59, 652 S.W.2d 839 (1983). Unemployment benefits are intended to benefit employees who lose their jobs through no fault of their own. *Bradford v. Director,* 83 Ark. App. 332, 128 S.W.3d 20 (2003) (citing *Osterhout v. Everett,* 6 Ark. App. 216, 639 S.W.2d 539 (1982)). The policy of the Arkansas Employment Security Act is "to encourage employers to provide more stable employment" and to systematically accumulate "funds during periods of employment from which benefits may be paid for periods of unemployment." Ark. Code Ann. § 11-10-102 (Repl. 2002).

■ Where the language of a statute is plain and unambiguous, legislative intent is determined from the ordinary meaning of the language used. *Ford v. Keith,* 338 Ark. 487, 996 S.W.2d 20 (1999). While not conclusive, an administrative agency's interpretation of a statute is highly persuasive and will not be overturned unless it is clearly wrong. *Death & Perm. Total Dis. Trust Fund v. Brewer,* 76 Ark. App. 348, 65 S.W.3d 463 (2002). Changes to statutes by subsequent amendments can be used as a determining factor to legislative intent. *Pledger v. Mid-State Constr. & Materials, Inc.,* 325 Ark. 388, 925 S.W.2d 412 (1996).

In its brief Southwestern Bell states that, after it declares a surplus, "employees are canvassed to determine if they are interested in the VSP." Eligible employees are then allowed to apply for the VSP, under which the employee may be offered a severance payment in exchange for their voluntary retirement. Simmons testified that the Voluntary Candidate Request Forms were available on his desk to employees who request them. In this instance, after the surplus was announced in his force adjustment area, Barkley decided to apply for the VSP. He requested and completed the form, and Southwestern Bell sent him a conditional offer. The

offer stated that, if Barkley accepted, he would be added to a pool of voluntary severance candidates and that his acceptance would be irrevocable. Barkley accepted the offer, and Southwestern Bell "matched" Barkley with another employee whose job would otherwise be at risk. Barkley then left his employment with Southwestern Bell.

Southwestern Bell strongly asserts that it absolutely did not ask for volunteers. It argues that the only thing it did in this case was to "make the VSP available, as it is required to do 'pursuant to [its] union contract' whenever a surplus is declared," and that the use of the term "offer" in the VSP was incorrectly translated by the Board to mean "ask." Southwestern Bell maintains that providing an opportunity for its employees to volunteer is not the same as asking for volunteers. This argument, however, is not persuasive.

Southwestern Bell may not have addressed each employee directly to ask them if they would volunteer, but Southwestern Bell's policy of making the VSP available to employees when there is an announced surplus provided the means by which the employees could volunteer to leave their employment and reduce the surplus. This policy is essentially a way for Southwestern Bell to solicit volunteers for its VSP.

■■ This court does not engage in statutory interpretations that defy common sense and produce absurd results. *Green v. Mills*, 339 Ark. 200, 4 S.W.3d 493 (1999). The legislature amended Ark. Code Ann. § 11-10-513 to add subsection (c), which supports the fact that the legislature intended to provide benefits to employees under circumstances such as in the present case. Thus, the Board's finding that Barkley left his employment with Southwestern Bell after it asked for volunteers for a permanent work force reductions and that he is entitled to unemployment benefits under Ark. Code Ann. § 11-10-513(c) is supported by substantial evidence.

Affirmed.

BAKER, J., agrees.

CRABTREE, J., concurs.

TERRY CRABTREE, Judge, concurring. At issue in this appeal is the newly-enacted provision of Ark. Code Ann. § 11-10-513 that allows unemployment compensation benefits to an individual who quits his job when he has "voluntarily participated in

a permanent reduction in the employer's work force after the employer announced a pending reduction in its work force and asked for volunteers." Ark. Code Ann. § 9-10-513(c)(1) (Supp. 2003). I am in full agreement with Judge Roaf's application of the statute, as it is written, to the facts of this case and the holding that the Board's decision is supported by substantial evidence. I write separately only to express my concern about benefits being awarded to someone in this claimant's position.

The policy objectives of employment security law are to "lighten [the] burden which may fall with crushing force upon the unemployed worker and his or her family" and to provide benefits for "persons unemployed through no fault of their own." Ark. Code Ann. § 11-10-102(1) & (3) (Repl. 2002). The statute under consideration, as applied here, does not comport with these laudable goals. In accepting the VSP, the claimant received a severance payment of $46,700, a lump-sum pension payment of $244,000, and $4,000 for unused vacation time. Now in addition, the statute permits him to receive unemployment compensation, even though his voluntary separation from work caused no undue hardship. Not every person who participates in a qualifying voluntary layoff will be fortunate enough to receive a lucrative severance package, and thus the statute serves to protect those deserving individuals in their time of need. However, it strikes me as obscene for unemployment benefits to be awarded someone who received almost $295,000 for quitting his job. Although it is for legislators, not judges, to write the laws, this case demonstrates that perhaps the statute sweeps too broadly to benefit persons who are not financially burdened by a voluntary layoff.