The Honorable Jim Argue State Senator 5300 Evergreen Drive Little Rock, Arkansas 72205-1814
Dear Senator Argue:
I am writing in response to your request for an opinion on a question arising in light of Senate Bill 139, which you are sponsoring in the current legislative session. Specifically, you relay the following information and pose the following question:
Arkansas Code § 24-1-105 provides:
 When any retirement system on or after March 14, 1995, has unfunded actuarial accrued liabilities being amortized over a period exceeding thirty (30) years, that system shall not have a legislated benefit enhancement until the unfunded actuarial accrued liability is reduced to a level less than the standards set by this subchapter.
 The unfunded actuarial accrued liability of the Arkansas Teacher Retirement System currently exceeds thirty years. I am sponsoring SB 139 in the Senate, which would provide an exemption from the Arkansas Teacher Retirement System earnings limitation for retired teachers entering into employment with the Department of Education. My question is this: does SB 139 constitute a "legislated benefit enhancement" so as to prevent its implementation should it become law? *Page 2 
You ask, as I develop my response, to "bear in mind that the earnings limitation does not apply to ATRS retirees who pursue second careers in the private sector" and that "the benefit currently exists, and SB 139 simply allows the Department of Education to compete on a level playing field with private employers as they recruit for key staff members."
RESPONSE
The question you pose appears to be more suited to an actuarial determination than a legal analysis. I, of course, am not an actuary and cannot determine the impact of SB 139 on the actuarial soundness of the Arkansas Teacher Retirement System ("ATRS"). The General Assembly and ATRS employ actuaries for this purpose. I can only conclude that the legislative history surrounding the waiver to the earnings limitation in A.C.A. § 24-7-708 appears to reflect that the creation or expansion of the waiver provision has been, in the past, treated by the General Assembly as a "benefit enhancement." Without clear direction in SB 139 as to the status of the waiver in that regard, it appears that SB 139, if adopted, would be construed alongside A.C.A. § 24-1-105, requiring non-implementation of the bill absent a change in the unfunded accrued liabilities of the system. Absent express language on this point in the bill,[1] therefore, the answer to your question appears to be "yes."
The "earnings limitation" you mention is currently codified at A.C.A. § 24-7-708 (Supp. 2005), which provides as follows:
 (a) Except for a waiver as provided for in subsection (f) of this section, if a retirant is an employee of a public employer whose employees are covered by the Arkansas Teacher Retirement System, then, for each twelve-month period ending June 30, the amount of his or her system annuity shall be subject to the limitations equivalent to twice the limitations imposed by the social security retirement test.
 (b) For each year ending June 30, the social security retirement test to be considered shall be the test in effect for the calendar *Page 3 
year beginning the January 1 immediately preceding June 30. The retirant's earnings shall be his or her remuneration for the employment for the year ending June 30.
 (c) The Board of Trustees of the Arkansas Teacher Retirement System shall establish equivalent limitations by appropriate rules and regulations.
 (d) Receiving remuneration as an employee from any private employer or as a member of the General Assembly shall not affect payment of an annuity.
 (e) During any period of employment in a position covered by the system, a retirant shall not accrue additional credited service.
 (f)(1) In accordance with rules and regulations adopted by the State Board of Education, the Department of Education may request of the board of trustees or its designee a waiver of the conditions subjecting annuities to limitations. If approved by the board of trustees or its designee, the waiver shall be effective for a one-year period, with the option to renew annually for up to a total of three (3) years as requested by the department.
 (2) A waiver of the conditions subjecting annuities to limitations may be requested if the retirant is hired by a public school district due to a shortage of certified teachers in a critical academic area in which the retirant is certified.
 (3) The critical academic areas in which there is a shortage of certified teachers shall be determined annually by the State Board of Education.
 (4) School districts shall maintain audit files identifying personnel granted a waiver and documenting the reasons for the waiver.
 (5) Beginning July 1, 2005, for any retired member employed in a position covered by the system pursuant to a waiver, the *Page 4 
employer and employee contribution rate to the system on behalf of the member shall recommence at the rate in effect at the time of the employment and shall be remitted by the employer.
The current social security earnings limitation for persons who have not reached "full retirement age" is $12,960. Seewww.socialsecurity.gov. Apparently, the statute's mandate to subject ATRS benefits to "limitations equivalent to twice the limitations imposed by the social security retirement test" has been interpreted to reduce benefits where earnings exceed twice $12,960, or $25,920. As with the test for social security, for every two dollars over the limit, one dollar is withheld from ATRS retirement benefits. Seewww.socialsecurity.gov and Policies and Procedure Manual, Arkansas Teacher Retirement System, "Conditions under Which a Retirant May Return to Covered Service Without Rescinding Retirement" "Age and Service Retirant" § 1(B).
The earnings limitation only applies to reemployment with a public employer whose employees are covered by the Arkansas Teacher Retirement System. As you note, private employment does not subject the retirant to any reduction in retirement benefits. The current statute, however, provides for a "waiver" of the earnings limitation in certain instances under which the reemployed retirant's benefits are not subjected to any limitation due to his or her earnings. If a waiver is granted, however, a recent 2005 amendment to the statute requires the employer to remit both the employee and employer contribution to the system. See Acts 2005, No. 911 and A.C.A. § 24-7-708(f)(5) (Supp. 2005). The applicable rules and regulations make clear that the employee contribution in that instance is not withheld from the employee's pay. See Policies and Procedures Manual, supra "Waiver of Earnings Limitation at § 5. Retirants who return to service may not accrue any additional service credit, either under the earnings limitation or with a waiver from that restriction.
Senate Bill 139 would amend this section to add an additional subsection (g) that would provide as follows:
 (g)(1) A retired member entering into a position of employment with the Department of Education is exempt from this section and shall be employed with no limitations placed on his or her earnings. *Page 5 
 (2) For any retired member returning to work under subdivision (g)(1) of this section, the employer and employee contribution rate to the system on behalf of the member shall recommence at the rate in effect at the time of the employment and shall be remitted by the employer.
This provision would in essence grant an exemption or automatic waiver from the earnings limitation for any retirant wishing to return to employment with the Department of Education.[2] Such individuals would not face a reduction in their retirement benefits irrespective of their salary at the Department of Education. As with other waivers since 2005, the Department of Education would have to forward both the employee and employer contribution to the system on behalf of the reemployed retiree.
Your question is whether SB 139 constitutes a "legislated benefit enhancement" so as to prevent its implementation under the provisions of another existing statute, A.C.A. § 24-1-105, set out earlier in this opinion. The term "legislated benefit enhancement" is not defined in the applicable statutory scheme or elsewhere in Arkansas law.
I recently noted in Op. Att'y Gen. 2007-037 "the Attorney General's lack of authority to supply a definition of a term that the legislature has not defined." See also, Ops. Att'y Gen. 2006-028; 2005-284; 2005-020; and 2000-338, at 2, quoting Op. Att'y Gen. 1998-025 ("[t]his office has consistently taken the position that in the absence of a legislatively-or judicially-formulated definition, it is inappropriate for the Attorney General, being a member of the executive branch of government, to formulate a controlling definition.")
Where a term is not defined, however, the Arkansas Supreme Court applies the rules of statutory construction to determine its meaning. As stated in K.N. v. State, 360 Ark. 579, 584, 203 S.W.3d 103 (2005):
 The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. Raley v. Wagner, *Page 6 346 Ark. 234, 57 S.W.3d 683 (2001); Dunklin v. Ramsay, 328 Ark. 263, 944 S.W.2d 76 (1997). When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. Stephens v. Arkansas Sch. for the Blind, 341 Ark. 939, 20 S.W.3d 397 (2000); Burcham v. City of Van Buren, 330 Ark. 451, 954 S.W.2d 266 (1997). Where the meaning is not clear, we look to the language of the statute, the subject matter, the object to be accomplished the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject. Stephens v. Arkansas Sch. for the Blind, supra (citing State v. McLeod, 318 Ark. 781, 888 S.W.2d 639
(1994)). Finally, the ultimate rule of statutory construction is to give effect to the intent of the General Assembly. Ford v. Keith, 338 Ark. 487, 996 S.W.2d 20 (1999); Kildow v. Baldwin Piano Organ, 333 Ark. 335, 969 S.W.2d 190 (1998).
Id. at 584, 585, quoting Weiss v. American Honda Finance Corp.,360 Ark. 208, 200 S.W.3d 381 (2004).
In addition, other related rules of statutory construction provide that in construing any statute, courts will place it beside other statutes relevant to the subject matter in question and ascribe meaning and effect to be derived from the whole. State v. Sola, 354 Ark. 76,118 S.W.3d 95 (2003).
The court has sometimes resorted to dictionary definitions in order to determine the meaning of a word or phrase, see Arkansas Tobacco ControlBoard v. Santa Fe Natural Tobacco Company, 360 Ark. 32, 39,199 S.W.3d 656 (2004), or to "legal" dictionary definitions, Harold Ives TruckingCompany v. Pickens, 355 Ark. 407, 411 139 S.W.3d 471(2003). The court has stated, however, that it is not limited, in construing the meaning of a word or phrase to dictionary definitions. See, e.g., Bill FittsAuto Sales, Inc. v. Daniels, 325 Ark. 51, 55, 922 S.W.2d 718 (1996). The court has sometimes looked to definitions adopted in other states,Harold Ives Trucking Company v. Pickens, supra; or to the history of a statute and the record of the court's interpretation of it. Lawhon FarmServices v. Brown, 335 Ark. 272, 279, 984 S.W.2d 1(1998). *Page 7 
Unfortunately, there is no applicable dictionary definition of the words "legislated benefit enhancement" and I can find no helpful decisions from this state or sister states interpreting similar terms. In my opinion this term does not have an "ordinary and usually accepted meaning in common usage," or a fixed legal significance and is therefore ambiguous.
As for any dictionary definitions of the individual words constituting this term, the definition of "benefit" is in common parlance broadly defined as "something that it advantageous or good; an advantage," or "a payment or gift, as one made to help someone or given by a benefit society, insurance company, or public agency." Random House Webster'sUnabridged Dictionary, (2d Ed. 2001) at 94. The definition of "enhance" is "to raise to a higher degree; intensify; magnify; or "to raise the value or price of." Id. at 646. Under these definitions, a legislated "benefit enhancement" would appear to be a law that enlarges or raises the value of the retirement benefit.
Additional insight into the meaning or scope of the term "legislative benefit enhancement" may also be gained from "the object to be accomplished [and] the purpose to be served. . . ." See Weiss, supra.
Some evidence of the "object to be accomplished" and the "purpose to be served" by A.C.A. § 24-1-105 with regard to restriction of "legislated benefit enhancements" can be gleaned from the language ofAct 613 of 1995, which adopted the provision. In this regard, the emergency clause contained in that act provided that:
 It is hereby found and determined by the Eightieth General Assembly of the State of Arkansas that the fiscal soundness of the various state-supported retirement systems is vital to the operation of Arkansas state government; that the proper fiscal management of public retirement systems promotes the goal of good government and provides public employees with an incentive to perform efficiently and effectively; and that any delay in implementing a policy of sound fiscal management with regard to state-supported retirement systems could result in a financial disaster for any marginally financed retirement system in Arkansas. Therefore, in order to prevent a potential financial catastrophe, an emergency is hereby declared to exist, and this act being necessary for the immediate preservation of the public *Page 8 
peace, health, and safety, shall be in full force and effect from and after its passage and approval.
Id. at § 6.
Obviously, Act 613 of 1995, which was ultimately codified as the statute you reference, was concerned with the actuarial soundness of state-supported retirement systems. See also, A.C.A. §§ 24-1-101
and-102 (Repl. 2000). Clearly, the intent was to preserve the financial integrity of the state retirement systems and to prevent a "potential financial catastrophe."
Additional evidence of legislative intent may be gleaned from related statutes on the topic and the applicable legislative history. See Weiss,supra. In this regard, A.C.A. § 10-3-702 (Repl. 2002), which addresses the introduction of bills relating to retirement systems in the General Assembly, provides that:
 No bill amending an existing publicly supported retirement system by increasing the multiplier, changing terms of or allowing the purchase of credited service, shortening vesting periods or shortening years of service required for standard retirement without penalty, or which would establish a new or expanded public retirement program shall be acted upon in either house until the fiscal note[3] provided for in subsection (a) of this section has been attached to the bill . . .
A.C.A. § 10-3-702(b)(3)(A). (Emphasis added). The language above is some evidence of the types of legislative actions that may lead to "benefit enhancements." The broad language at the end of the statutory subdivision above, which includes bills that would "establish a new or expanded public retirement program," could encompass a number of actions not specifically listed in the enumerated items and is conceivably broad enough to include an "expanded" waiver program. *Page 9 
As for the legislative history, it is helpful to review it with regard to allowable waivers to the § 24-7-708 earnings limitation in connection with the § 24-1-105 restriction on benefit enhancements in order to determine whether or to what extent such waivers can constitute "benefit enhancements." The original "waiver" of the earnings limitation contained in A.C.A. § 24-7-708 was adopted in Act 30 of 1999. It provided for a generic waiver, to be effective for one year and renewable annually. See former A.C.A. § 24-7-708(f). It was not restricted to any particular types of employees or dependent upon the particular ATRS-covered entity with which the retiree was reemployed. This Act, however, itself contained the same type of actuarial limitation as found in A.C.A. § 24-1-105, that "no benefit enhancement" provided for in the act shall be implemented until the system's liabilities were under thirty years amortization. See also A.C.A. §24-1-106 (Supp. 2005) (codifying this provision along with similar provisions contained in numerous other retirement acts). The only purpose of Act 30 of 1999 was to add the waiver provision, so obviously, by adding the limitation on implementation of any "benefit enhancement" contained in the act, the General Assembly deemed the original waiver provision to possibly fall within the definition of a "benefit enhancement." Stated differently, it seems likely that the General Assembly equated that particular waiver with a "benefit enhancement."
Later, Act 1146 of 2001 provided for an "automatic" waiver from the earnings limitation in cases involving retirees returning to work due to a shortage of teachers in a critical academic area or in school districts in academic distress. It was a one-year waiver that could be renewed annually. The 2001 act also contained the "no benefit enhancement" implementation language, although the act stated that it was not required to be codified.
In 2005, another amendment was made to the earnings limitation in A.C.A. § 24-7-708. Act 911 of 2005 took away the "automatic" nature of the waiver in instances of teacher shortages in critical academic areas and repealed the waiver allowed for teachers returning to work in districts in academic distress. It also limited the remaining waivers to a total of three years. The 2005 act did not contain any "no benefit enhancement" language, presumably because the 2005 act restricted, rather than expanded, any ability to obtain a waiver of the earnings limitation. Act 911 of 2005 also added what is now A.C.A. §24-7-708(f)(5), which imposed a new requirement on employers hiring retirees under a waiver. After this amendment, employers were required to remit both the employee and employer contributions on behalf of the retiree, despite the fact that the retiree was *Page 10 
not allowed to accrue any additional service credit during the period of his reemployment. It is my understanding that this provision was added to compensate for the fact that, under former law, by rehiring a retiree, the opportunity to hire another employee who would be actively contributing to the system would be lost and would ultimately impact the actuarial soundness of the system. This act demonstrates, once again, the General Assembly's concern with the financial integrity of the state retirement system.
There is thus some support for the proposition that, at least before 2005, the General Assembly deemed waivers from the earnings limitations to be included in the definition of "benefit enhancements." Otherwise, it would not have added the "no benefit enhancement" language to the statute when providing for, or expanding available waivers. Senate Bill 139, about which you inquire, also expands the allowable waivers under A.C.A. § 24-7-708. It is thus possible, in light of the legislative history of the provision, that it would be construed as a "benefit enhancement." Obviously, allowing reemployed retirees to retain all of their retirement benefits upon reemployment with a particular employer is an increase in benefits over current law, which requires the benefits of such persons to be reduced when reemployed with that employer.
Of course, this analysis assumes that retirees would return to employment with that particular ATRS-employer with or without the exemption. That may be an unwarranted assumption where the retirees may instead decide to seek reemployment elsewhere with no reduction in benefits. As you note, the earnings limitation "does not apply to ATRS retirees who pursue second careers in the private sector." You state that the "benefit currently exists. . . ," implying that no ATRS retiree would choose to return to work at an ATRS-covered employer and accept the reduction in benefits under current law. Just as it may be unwarranted to assume that all retirees would choose to return to employment with an ATRS employer even without an exemption, it may also be unwarranted to assume that none would choose to do so. It is possible that the facts would lie somewhere between these two extremes. In addition, this same type of argument did not stop the General Assembly from apparently characterizing previous waiver expansions as "benefit enhancements." See again, Acts 2001, No. 1146 and 1999, No. 30. Moreover, in a broader sense, a law such as SB 139 enlarges the available employers to which the retiree can return with no reduction in benefits. In a larger sense, therefore, the bill may be viewed as "expanding" an existing retirement program. See A.C.A. § 10-3-702(b)(3). *Page 11 
In my opinion, however, the provisions of A.C.A. § 24-7-708(f)(5) throw a slight wrinkle into this analysis. That subsection, added in 2005, requires an ATRS-covered employer who hires an ATRS retiree to remit both the employer and employee contributions to the system in connection with the employment of the retiree. This equates to an amount equal to 6% of the employee's salary (for the employee contribution), plus 14% of the employee's salary (for the employer contribution), or a total of 20% of the reemployed retirant's salary. See A.C.A. §§ 24-7-406(b) and 24-7-401(c)(4). This requirement obtains despite the fact that the reemployed retirant will receive no additional credited service in the system or increase in benefits by virtue of the reemployment. If the case of a particular reemployed retiree is viewed in isolation, therefore, it may be argued that the reemployment of the retiree would be a net gain to the retirement system, which will receive the applicable contributions with no increased liability for paying additional benefits.
Again, however, this calculation depends upon whether the retiree would have chosen to return to work at the Department without the exemption. If he would have, the 20% salary remittance must be weighed against what would otherwise have been his reduction in benefits in order to determine any net loss or gain to the system. This calculation depends upon the benefits of the particular employee and his salary upon reemployment. It is impossible to state in every case that the 20% remittance would make up for what would otherwise have been the two for one reduction in the retiree's benefits. In the case of an employee who would not have otherwise returned to employment at the Department, the system may suffer no adverse effects from the reemployment. It is impossible to know, however, whether employees seeking to take advantage of SB 139's provisions would or would not have returned to work without such a waiver. In addition, broader actuarial considerations may come into play in light of how the exemption to the earnings limitation may affect the retirement decisions of current non-retiree system members.
This entire area of analysis thus seems more suited to an actuarial determination than a legal analysis. I, of course, am not an actuary and cannot determine the impact of SB 139 on the actuarial soundness of the Arkansas Teacher Retirement System. The General Assembly and ATRS employ actuaries for this purpose. Although any actuarial impact of Senate Bill 139 may be slight, I can only conclude that the legislative history regarding the various waivers to the earnings *Page 12 
limitation in A.C.A. § 24-7-708 appears to reflect that expansion of such waivers has been treated by the General Assembly as a "benefit enhancement." It is my understanding that this is the interpretation of officials at ATRS. An administrative agency's interpretation of the relevant statute is highly persuasive. See, e.g., Dep't of HumanServices v. Parker, 88 Ark. App. 222, 197 S.W.3d 33 (Nov. 3, 2004). Such an administrative interpretation will not be disregarded unless the interpretation is clearly wrong. Ark. Soil Water Consv. Comm'nv. Bentonville, 351 Ark. 289, 92 S.W.3d 47 (2002); see alsoSouthwestern Bell Corp. v. Ark. Employment Security Department,93 Ark. App. 303, ___ S.W.3d ___ (Nov. 30, 2005). Without clear direction in SB 139 as to the status of the waiver as a "benefit enhancement," it appears that SB 139, if adopted, would be construed alongside A.C.A. § 24-1-105, requiring non-implementation of the bill absent a change in the unfunded accrued liabilities of the system.
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] Section 24-1-105 is a legislatively adopted provision, and could presumably be overridden by a later legislative enactment.
[2] The Department is apparently an ATRS-covered employer. See A.C.A. § 24-7-202 (Supp. 2005).
[3] The "fiscal note" referenced in subsection (a) reflects the "estimated cost or fiscal impact of the bill upon the revenues of the State of Arkansas and its various agencies and upon the actuarial soundness of the retirement systems." A.C.A. § 10-3-702(a). Two other subsections of this statute, which required each bill identified in subsection (b)(3) above to contain the "benefit enhancement" non-implementation language, was recently repealed. See
Acts 2007, No. 237. *Page 1